# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| UNOWEB VIRTUAL, LLC, | Civil Case No. 2:16-cv-00452-JRG |
| Plaintiff, | CONSOLIDATED LEAD CASE |
| v. | |
| EBAY, INC., | JURY TRIAL DEMANDED |
| Defendant. | |

| | |
|---|---|
| UNOWEB VIRTUAL, LLC, | Civil Case No. 2:16-cv-00459-JRG |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| COMCAST CABLE COMMUNICATIONS, LLC, and | |
| NBCUNIVERSAL MEDIA, LLC, | |
| Defendants. | |

## DEFENDANT COMCAST CABLE COMMUNICATIONS, LLC AND NBCUNIVERSAL MEDIA, LLC'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ................................................................................................................... 4

I.    UnoWeb's Addition Of The Phrase "On A Computer" Is Insufficient To Render The
      Claims Patentable ........................................................................................................ 5

II.   The Asserted Patents Are Directed To Well-Known Business Practices ................. 6

ARGUMENT ........................................................................................................................ 7

I.    Subject-Matter Eligibility Is a Threshold Test Properly Addressed at the Pleadings Stage ........ 7

II.   The Supreme Court's Seminal Decision in *Alice* Sets Forth a Two-Part Test for Subject-
      Matter Eligibility Under 35 U.S.C. § 101 .............................................................. 8

III.  UnoWeb's "Invention" of Providing Content From Multiple Sources (i.e. Electronic Mall
      Patents) is an Unpatentable Abstract Idea .............................................................. 9

IV.   The Asserted Claims Of Electronic Mall Patents Do Not Disclose an "Inventive Concept" .... 14

      A.   The Claims Recite Only Generic Computers to Perform The Limitations .................... 15

      B.   The Claims of the '047 Patent Fail To Disclose an Inventive Concept ........................ 18

      C.   The Claims Fail the Machine-or-Transformation Test ................................................. 19

      D.   Dependent Claims Include Trivial Limitations that Fail to Amount to an "Inventive
           Concept" ..................................................................................................................... 20

V.    UnoWeb's "Invention" of Sharing Revenues With Multiple Parties is an Unpatentable
      Abstract Idea ............................................................................................................. 21

      A.   The Revenue Sharing Patents Do Not Provide a Technical Solution To a Technical
           Problem ..................................................................................................................... 23

VI.   The Asserted Claims Of Revenue Sharing Patents Do Not Disclose an "Inventive Concept" .. 26

      A.   The Claims Recite Only Generic Computers to Perform Conventional Steps .............. 26

      B.   The Revenue Sharing Claims Fail the Machine-or-Transformation Test ...................... 27

      C.   Dependent Claims Include Trivial Limitations that Fail to Amount to an "Inventive
           Concept" ..................................................................................................................... 28

VII.  The Court Should Dismiss UnoWeb's Allegations of Induced Infringement .......................... 29

CONCLUSION .................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Accenture Global Services, GmbH v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013)................................................................14, 15

*Affinity Labs of Tex., LLC v. DirecTV, LLC*,
    109 F. Supp. 3d 916, 926 ......................................................................6, 8

*Alice Corp. v. CLS Bank Int'l*,
    134 S.Ct. 2347 (2014)........................................3, 4, 8, 9, 14, 15, 18, 19, 26, 30

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
    56 F. Supp. 3d 813, 823 (E.D. Va. 2014) ..........................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................7, 30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................7

*Bilski v. Kappos*,
    561 U.S. 593 (2010)................................................................8, 14, 19, 26

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014)..........................................................17, 25, 27

*Clear with Computers, LLC v. Altec Indus., Inc.*,
    No. 6:14-cv-00089-JRG, 2015 WL 993392 (E.D. Tex. Mar. 3, 2015)........................8

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d (Fed. Cir. 2014)..........................................8, 10, 17, 23, 25, 26

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011)..........................................................24, 25, 27

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014)..........................................................12, 18, 19

*DSU Med. Corp. v. JMS Co.*,
    471 F.3d 1293 (Fed. Cir. 2006) (en banc)..........................................................29

*Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP*,
    128 F. Supp. 3d 103, 112 (D.D.C. 2015), aff'd, No. 15-7100, 2016 WL
    3545138 (D.C. Cir. June 10, 2016) ......................................................16

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016)........................................................................8

*Genetic Technologies Ltd. v. Bristol-Myers Squibb Co.*,
   72 F. Supp. 3d 521, 526 (D. Del. 2014)........................................................3

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011)........................................................................................29

*Hockerson–Halberstadt, Inc. v. Avia Group Int'l, Inc.*,
   222 F.3d 951 (Fed. Cir. 2000)........................................................................3

*In re Bilski*,
   545 F.3d 943 (Fed. Cir. 2008) (en banc)..............................................20, 28

*In re TLI Communications LLC Patent Litigation, L.L.C.*,
   --- F.3d ----, 2016 WL 2865693 (Fed. Cir. May 17, 2016)..................4, 13

*Internet Patents Corp. v. Active Network, Inc.*,
   790 F.3d 1343 (Fed. Cir. 2015)..................................................................8, 13

*Joao Control & Monitoring Sys, LLC v. Telular Corp.*,
   No. 14 C 9852, 2016 WL 1161287 (N.D. Ill. Mar. 23, 2016).............8, 21, 29

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   132 S. Ct. 1289 (2012)..............................................................................4, 9, 14

*The Money Suite Company v. 21st Century Insurance and Finance Services, Inc.
et al.*,
   No. 13-984, 2015 WL 436160 (D. Del. Jan. 27, 2015) ............................10

*OIP Technologies, Inc. v. Amazon.com, Inc.*,
   788 F.3d 1359 ..................................................................................................3

*OpenTV v. Netflix*,
   76 F.Supp.3d 886, 893 (N.D. Cal. 2014) ...............................................26, 27

*Shortridge v. Payroll4Construction.com*,
   No. 3-14-cv-04850, 2015 WL 1739256 (N.D. Cal. Apr. 14, 2015) ..........23

*Tierra Intelectual Borinquen, Inc. v. ASUS Computer Int'l, Inc.*,
   Case No. 2:13-cv-38-JRG, 2014 WL 894805 (E.D. Tex. Mar. 4, 2014).........29, 30

*Ultramercial v. Hulu, LLC*,
   772 F.3d 709 (Fed. Cir. 2014)......................4, 8, 13, 14, 17, 19, 20, 25, 26

## STATUTES

35 U.S.C. § 101.......................................1, 3, 5, 8, 9, 10, 16, 17, 18, 19, 23, 25, 27, 30

**OTHER AUTHORITIES**

Dkt. 72, "Complaint" ...........................................................................................................1

Exhibit H. <u>Nothing else changed</u> .............................................................................3, 5

Federal Rule of Civil Procedure 12(b)(6) .........................................................................1, 7

U.S. Patent Nos. 7,580,858 ..........................................................2, 3, 5, 22, 23, 24, 26, 28

U.S. Patent Nos. 7,941,345 ..........................................................2, 4, 5, 10, 11, 17, 20, 21

Defendants Comcast Cable Communications, LLC ("Comcast") and NBCUniversal Media, LLC ("NBCU") respectfully move to dismiss the First Amended Complaint (Dkt. 72, "Complaint") filed by Plaintiff UnoWeb Virtual, LLC ("UnoWeb") for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[1] The Court should dismiss the Complaint because the claims of the six patents asserted by UnoWeb are directed at fundamental, longstanding concept implemented using computers over the Internet, and are invalid as a matter of law for failing to claim patentable subject matter under 35 U.S.C. § 101.

## PRELIMINARY STATEMENT

UnoWeb's one hundred and five page Complaint consists largely of a rambling recitation of conclusory assertions aimed at propping up patent claims directed to abstract ideas. Stating nothing more than threadbare recitals that its patents are directed to technical solutions to unique problems faced on the Internet, UnoWeb repeatedly states that its patents satisfy criteria that make its claims patent-eligible. *See e.g.*, Dkt. 72 at ¶¶ 57, 74, 75, 95, 98, 100, 101, 115, 117, 118, 138, 149, 157, 165, 167, 174, 183, 184, 186, 187, 201, 209. Such unsupported assertions of patent-eligibility do not breathe a life of patentability where none exists. Patentability of inventions is judged by the substance of the patent claims, not on the conclusory assertions of eligibility in a patentee's complaint.

A significant portion of UnoWeb's Complaint is devoted to statements by third-parties regarding their own work in the area of e-commerce, which does not pertain to any of the asserted patents. *See e.g.*, Dkt. 72, ¶¶ 52, 64-72, 142, 144, 145. Similarly, UnoWeb directs an entire section of the Complaint to discussing its history and prior development, repeatedly invoking its mantra that this work was unique to the Internet, but without reference to the scope of its asserted claims. *See e.g.*,

---

[1] NBCU joins this motion with respect to Sections I-IV and VII only. The patents discussed in Sections V and VI have not been asserted against NBCU.

Dkt. 72, ¶¶ 2, 4, 5, 6, 13, 19, 20 n.20, 21. None of these statements shed light on the patentability of the claims. UnoWeb's repetition of such statements throughout its Complaint may distract attention from the underlying patent claims, but the infirmities of the patents cannot be cured by the draftsmanship of its counsel.

Turning to the merits of the Complaint, UnoWeb asserts six patents from two patent families against Comcast in this suit. The first patent family, comprising of U.S. Patent Nos. 7,941,345 (the '345 Patent, attached as Ex. A), 8,065,386 (the '386 Patent, attached as Ex. B) and 8,307,047 (the '047 Patent, attached as Ex. C), claims priority to an application filed on October 20, 2001. These patents share the same specification that generally discloses an electronic shopping mall, and are collectively referred to herein as the "Electronic Mall Patents." The second patent family, comprising of U.S. Patent Nos. 7,580,858 (the '858 Patent, attached as Ex. D), 7,987,139 (the '139 Patent, attached as Ex. E) and 8,140,384 (the '384 Patent, attached as Ex. F), claims priority to an application filed on February 21, 2007.[2] These patents pertain to the concept of sharing advertising revenue with content providers, and are collectively referred to herein as the "Revenue Sharing Patents."

The Electronic Mall Patents claim the concept of displaying items from multiple sources at the same time—a concept implemented in shopping malls and department stores for decades—over a computer network. The Revenue Sharing Patents, on the other hand, claim the idea of providing goods and services in return for revenue and sharing that revenue with multiple parties—again, a concept implemented by merchants and traders for centuries—on the web. In doing so, the claims of both patent families recite generic computer functionality to implement these longstanding fundamental concepts. *See e.g.*, '047 Patent at 4:36-52 (noting that the "present invention may take a

---

[22] The '858 and '139 Patents share the same specification. The '384 Patent is a continuation-in-part of the '139 Patent. The claims of the '384 Patent are, however, directed to the same unpatentable concept as the '858 and '139 Patents as discussed below. *See infra* Sections A.V and A.VI.

form of an entirely software embodiment or an embodiment combining software and hardware …
[or] a computer program product on a computer-readable storage medium having computer-readable
program code….”); *see also* ’858 Patent at 2:34-36 (same). UnoWeb’s patents simply rely on generic
computer technology operating in conventional fashion to implement fundamental business concepts.

Well before *Alice Corp. v. CLS Bank Int'l*, 134 S.Ct. 2347 (2014), was decided, the
patentee’s own statements made the ineligibility of the Revenue Sharing Patents explicit. During
prosecution, the examiner rejected the claims under Section 101 because they were “directed to non-
statutory subject matter.” *See* Exhibit G.[3] In response, the applicants amended the claims to simply
add the phrase “on a computer.” *See* Exhibit H. <u>Nothing else changed</u>, and the claims issued.
Similarly, the claims of the Electronic Mall Patents were repeatedly rejected under Section 101
during prosecution. The examiners rejected the claims under Section 101 because the claims were
directed to non-statutory subject matter, on multiple occasions. *See* Exhibit I; *see* Exhibit J. In each
instance, the applicants amended the claims to simply recite generic computer functionality to
overcome the rejection. *See* Exhibit K; *see* Exhibit L. Although these practices of reciting generic
computer functionality may have sufficed in 2009-2011 when the amendments were made, the
Supreme Court and the Federal Circuit have since made it clear that simply performing an abstract
idea “on a computer” is not patent eligible. A patent must do more than simply state the abstract idea
while adding the words “apply it with a computer.” *Alice*, at 2358.

In *Alice*, the Supreme Court clarified that patentees, such as UnoWeb, cannot circumvent the
prohibition on patenting abstract ideas by simply implementing these ideas via generic computers.
*See Alice*, at 2357-59. “Given the ubiquity of computers, ... wholly generic computer implementation

---

[3] Courts may take judicial notice of the prosecution history as a public record on a motion to dismiss, without
conversion to a motion for summary judgment. *See Genetic Technologies Ltd. v. Bristol-Myers Squibb Co.,* 72 F.
Supp. 3d 521, 526 (D. Del. 2014) (*citing Hockerson–Halberstadt, Inc. v. Avia Group Int'l, Inc.,* 222 F.3d 951, 957
(Fed. Cir. 2000)); *see also OIP Technologies, Inc. v. Amazon.com, Inc.,* 788 F.3d 1359 at 1363 (citing to the
prosecution history in determining patentability at the pleading stage).

is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1297 (2012)). In doing so, the Court rejected a method for mitigating risk in financial transactions implemented using specific program code. Recently and repeatedly, courts have held ineligible patent claims with implementation details and hardware components far more specific than those in UnoWeb's claims. *See In re TLI Communications LLC Patent Litigation, L.L.C.*, --- F.3d ----, 2016 WL 2865693, at *4-5 (Fed. Cir. May 17, 2016) (holding that claims aimed at storing and classifying images on the Internet using digital circuitry in telephones are an unpatentable abstract idea); *see Ultramercial v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) (holding that claims for distributing copyrighted products over the Internet to be abstract).

The reason for this prohibition on patenting abstract ideas is simple: allowing "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Mayo*, at 1293. The Court should reach the same result in this case as those reached in *Alice, TLI* and *Ultramercial*. Because UnoWeb's patents claim nothing more than abstract ideas dressed up in generic computer terminology, they do not pass muster under the test in *Alice*. For this reason, the Court should dismiss UnoWeb's Complaint for failure to state a claim upon which relief can be granted.

## BACKGROUND

UnoWeb alleges that Defendants infringe certain claims of the asserted patents by making, using, selling and offering for sale in the United States certain products and services for "web content management" and "internet advertising revenue sharing."[4] In doing so UnoWeb claims that it is

---

[4] UnoWeb's Complaint identified one set of asserted claims—claims 1-8 of the '345 Patent, claims 1, 4-8 of the '386 Patent, claims 1-3 of the '047 Patent, claims 2, 5-10 of the '139 Patent, claims 7-8 of the '384 Patent and

entitled to exclude others from using the longstanding concepts of providing information about goods and services from multiple vendors at the same location (*i.e.,* Electronic Mall Patents) or the fundamental business practice of sharing revenues with multiple parties in exchange for goods and services (*i.e.,* Revenue Sharing Patents).

## I.   UNOWEB'S ADDITION OF THE PHRASE "ON A COMPUTER" IS INSUFFICIENT TO RENDER THE CLAIMS PATENTABLE

The prosecution history of both asserted patent families demonstrates the deficiency of the claims under Section 101. During prosecution of the '858 Patent, the first in the family of Revenue Sharing Patents, the examiner rejected the claims under Section 101 because they were "directed to non-statutory subject matter." *See* Exhibit G. In response, the applicants amended the claims to simply add the phrase "on a computer." *See* Exhibit H. <u>Nothing else changed,</u> and the claims issued.

> [Claim 49] (previously presented): A method of web site development based on advertising revenue sharing, comprising the steps of:
>
> displaying paid content from an advertiser through a webpage of the web site <u>on a computer</u>;
>
> registering a content provider to prepare non-paid content for the webpage <u>on a computer</u>;
>
> totaling a number of interactions by the user with the paid content;
>
> receiving payment from the advertiser for the number of interactions of the user with the paid content; and,
>
> paying the content provider for the number of interactions of the user with the paid content,
>
> wherein the user is a registered user, and wherein the interaction of the registered user comprises clicking on a link to a new link destination within the paid content, provided that a second and subsequent clicking on the link by the same registered user is not an interaction to be counted in the step of totaling a number of interactions unless it exceeds a waiting-time threshold.

*See* Exhibit H at 3-4. Similarly, the claims of the Electronic Mall Patents were repeatedly rejected under Section 101 during prosecution. During prosecution of the '386 Patent and '047 Patent, the examiners rejected the claims because the claims were directed to non-statutory subject matter. *See*

---

claims 3 and 4 of the '858 Patent. *See* Dkt. No. 72 ¶¶  228, 255, 279, 304, 329, and 349. However, subsequent to the filing of the Complaint, UnoWeb served its infringement contentions (on Friday July 8, 2016) in which it modified its asserted claims. UnoWeb now appears to be asserting claims 1-8 of the '345 Patent (as originally asserted in the Complaint), claims 1-9 of the '386 Patent, claims 1-5 of the '047 Patent, claims 2, 5-7, and 10 of the '139 Patent, claim 6 of the '384 Patent and claims 3 and 4 of the '858 Patent. This Motion will address all claims asserted by UnoWeb in its Complaint and infringement contentions.

Exhibit I; *see* Exhibit J. In each case the applicant made no change to the claims other than to add recitation of generic computer elements. *Id.* Though the addition of a computer to the claims may have been deemed adequate under pre-*Alice* case law, such limitations are inadequate as a matter of law today.

## II.    THE ASSERTED PATENTS ARE DIRECTED TO WELL-KNOWN BUSINESS PRACTICES

The Electronic Mall Patents (the '345, '386 and '047 Patents) are directed to the fundamental business practice of combining content from multiple sources and providing it to consumers. Aggregating goods and services originating from multiple sources, and information about them, has been the function of merchants and marketplaces throughout human history.[5] In fact, UnoWeb's patents admit that at the time of the invention, electronic stores already sold products from multiple sources. *See* '047 Patent at 1:48-49 (conceding that VStore.com sold "products from distributors."). Thus, it is unsurprising that the Electronic Mall Patents do not purport to invent aggregation of information about related products in stores or malls, or even electronic shopping malls. Indeed, the patents state that electronic shopping malls were already in existence. *See* '047 Patent at 1:33-36 ("Today's e-commerce web sites henceforth called e-shop(s) are of a dynamic type with products and/or services that are available to a broad base of buyers. One good example of a dynamic e-shop is Amazon.com."). UnoWeb's claims merely take this longstanding business practice of aggregating content and implement it on the Internet using admittedly known computer functionality. *Id.* at 4:36-52 (describing that the "present invention" can be implemented using conventional web technology).

The Revenue Sharing Patents (the '139, '384 and '858 Patents) are similarly directed to a longstanding business practice of sharing revenues from the sales of a product with multiple known parties (*e.g.,* creator/manufacturer and distributor/provider), as has been a feature of sustained

---

[5] Courts are permitted to take judicial notice by making general historical observations when ruling on a 12(b)(6) motion. *See Affinity Labs of Tex., LLC v. DirecTV, LLC*, 109 F. Supp. 3d 916, 926 ("Patent '[e]l[i]gibility questions mostly involve general historical observations, the sort of findings routinely made by courts....'").

supply-chain networks for centuries. This is true in the case of sales of physical goods, as in sales of shoes at a shoe store by a sales person who earns a commission from the sale; and in the case of information and media companies, where the sales of advertisements produce revenues for publishers of content such as newspapers and magazines.

The Revenue Sharing Patents also include temporal restrictions on the frequency and amount of access that a user can have for certain content, in an attempt to avoid fraudulent accesses. Imposing temporal restrictions on customer access to prevent illicit use is also a well known business practice. For example, pharmacies and insurance companies routinely limit customer purchases of medication to a proscribed period for refills. Such restrictions prevent abuse of both the medications and the insurance company. UnoWeb's claims merely take the concept of temporally restricting access and implement it using admittedly known computers on the Internet. The concepts of sharing advertising revenue and imposing temporal restrictions on access are abstract. Any efforts to monopolize such concepts should be rejected.

## ARGUMENT

### I.   SUBJECT-MATTER ELIGIBILITY IS A THRESHOLD TEST PROPERLY ADDRESSED AT THE PLEADINGS STAGE

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual detail to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). The complaint must include sufficient "factual content allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 663 (2009). The Court "must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom," however, the Court "need not accept as true threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, at 678.

7

The issue presented in this motion—whether the asserted patents are directed to ineligible subject matter under Section 101—is a "threshold test." *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Accordingly, courts have repeatedly dismissed cases at the pleadings stage on Section 101 grounds, prior to any discovery or claim construction. *See, e.g.*, *Ultramercial*, 772 F.3d at 712; *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d, 1343, 1347 (Fed. Cir. 2014); *Clear with Computers, LLC v. Altec Indus., Inc.*, No. 6:14-cv-00089-JRG, 2015 WL 993392, at *3 (E.D. Tex. Mar. 3, 2015); *Affinity Labs*, 109 F. Supp. 3d at 921-23.

## II.   THE SUPREME COURT'S SEMINAL DECISION IN *ALICE* SETS FORTH A TWO-PART TEST FOR SUBJECT-MATTER ELIGIBILITY UNDER 35 U.S.C. § 101

In *Alice*, the Supreme Court set forth a two-part test to determine whether a patent is invalid under 35 U.S.C. § 101 for claiming ineligible subject matter. First, a court must "determine whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice*, 134 S. Ct. at 2355. To determine whether a patent claims an abstract idea, courts "start by ascertaining the basic character of the subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015). This "inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016); *see also Affinity Labs*, 109 F. Supp. 3d at 924. Important to this case, courts have recognized that patents that do nothing more than "data collection, recognition, and storage" or monitor and communicate information are directed to abstract ideas. *See, e.g.*, *Content Extraction*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known."); *Joao Control & Monitoring Sys, LLC v. Telular Corp.*, No. 14 C 9852, 2016 WL 1161287, at *7 (N.D. Ill. Mar. 23, 2016) ("monitoring and controlling property and communicating this information through generic computer functions" was an abstract idea).

Second, if the claims are directed to an abstract idea, the court must then "consider the elements of each claim individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Alice*, at 2357. The steps in the patent must be more than "well-understood, routine, conventional activity already engaged in by the scientific community." *Mayo*, 132 S. Ct. at 1298. "Simply appending conventional steps, specified at a high level of generality, is not enough to supply an inventive concept." *Alice*, at 2357. Nor is it enough to claim a "wholly generic computer implementation" of the abstract idea. *Id.* If a patent is directed to an abstract idea and lacks an inventive concept, the patent is invalid under Section 101. *Id.* at 2360. UnoWeb's patents fail both steps.

## III.   UNOWEB'S "INVENTION" OF PROVIDING CONTENT FROM MULTIPLE SOURCES (I.E. ELECTRONIC MALL PATENTS) IS AN UNPATENTABLE ABSTRACT IDEA

UnoWeb's Electronic Mall Patents seek to monopolize the basic idea of aggregating related content from multiple sources and presenting it in a bundled fashion. However, this concept was implemented well-before the filing of these patents. Indeed, since the advent of the first newspapers centuries ago, editors had been collecting content (*e.g.,* news stories) from multiple sources (*e.g.,* news reporters), which would then be aggregated into a single publication. This concept has since then been replicated in the context of shopping malls as well—the same field of use that the Electronic Mall Patents pertain to. Supermarkets have been in the business of providing content (*e.g.,* food items and merchandise) from multiple sources (*e.g.,* farms for fresh produce items and manufacturers for merchandise) for decades prior to the filing of the Electronic Mall Patents. Indeed, the specifications of the Electronic Mall Patents admit that existing websites had been aggregating and providing related content from multiple sources on the same website. *See e.g.,* '047 Patent at 1:42-49 ("One other type of e-commerce setup is the e-shopping mall where dynamic e-shops are created and updated directly by a user and henceforth called e-mall(s).... Thus, products/services

9

cannot be shared among other e-malls or e-shops even within their own network of dynamic e-shops at the e-mall. *Except VStore.com where all e-shop virtually sells products from distributors*.") (emphasis added). Thus, the specifications recognize that aggregation and provision of related content from multiple sources on a website was an existing practice, yet, the claims are directed to nothing more than this basic concept.[6]

Claim 1 of the '386 Patent, which is representative of all independent claims in the Electronic Mall Patents,[7] can be summarized as follows. *See* '386 Patent, at 23:38-63.[8]

| | |
|---|---|
| 1. A computer program product having executable instruction codes that are stored on a non-transitory computer-readable medium on a server computer, the instruction codes when executed by the server computer causes the server computer to provide unrequested content to a client computer and perform steps comprising: | *Recitation of generic computer elements* |
| requesting and receiving a plurality of objects in first content located on a content provider's server, the plurality of objects comprising key words; | *Requesting content from first source* |
| wherein the requesting and receiving is performed by the server computer; | *Requesting content from first source* |
| indexing the key words, wherein said indexing is performed by the server computer; | *Creating a database* |
| forming a database table containing each of the key words, wherein forming is performed by the server computer; | *Creating a database* |
| accessing the database table, wherein accessing is performed by the server computer; | *Accessing the database* |
| selecting a key word from within the database table, wherein selecting is performed by the server computer; | *Accessing the database* |
| identifying a second content by finding a relationship between the second content and the key word selected, wherein identifying is performed by the server computer; and | *Requesting content from second source* |
| sending the second content for receipt and display on the client computer, wherein sending is performed by the server computer. | *Displaying content from second source* |

---

[6] Defendants will first analyze the system claims. The asserted method claims (claims 1-8 of the '345 Patent) are no different in substance from the system claims and are, therefore, invalid for the same reasons, as discussed below.

[7] Courts have previously recognized that analyzing representative claims is appropriate in a Section 101 analysis. *See Content Extraction v. Wells Fargo*, 776 F.3d 1343; *see also, The Money Suite Company v. 21st Century Insurance and Finance Services, Inc. et al.,* No. 13-984, 2015 WL 436160 (D. Del. Jan. 27, 2015) (invalidating 887 claims based on an analysis of a single representative claim ).

[8] Claim 1 of the '386 Patent is representative of claims 4 and 8 of the '386 Patent and claim 1 of the '345 Patent. To the extent there are any differences in these claims, they will be discussed below.

The conceptual elements of this claim require nothing more than: (1) generic computer elements, (2) to request content from a first source, (3) create a database using the content from the first source, (4) using the entries in the database to request content from a second source. The claim does not provide any information on how to create and access the database or how to find a relationship between the words of the database and the content. They simply utilize databases in their ordinary fashion—making a table with an index of key words for later retrieval of information. *See* '047 Patent, Figs 13, 14, 16. In short, the claim provides no information on how to achieve or execute on this abstract method of aggregating and providing related content from multiple sources—one that had been performed for decades without the use of computers. Indeed, the Electronic Mall Patents acknowledge that the invention simply offers a single e-commerce solution—in other words, to combine content from multiple sources in a single webpage. *See* '047 Patent, at 1:61-2:10.

As shown above, claim 1 of the '386 Patent is a collection of steps that recite generic computer elements to request content from two sources. Claims 4 and 8 of the '386 Patent and claim 1 of the '345 Patent recite similar sets of steps that are aimed at requesting content from two sources. Claim 1 of the '345 Patent requires a "guiding means … for use in identifying related second content" instead of reciting the steps of creating and accessing a database table. However, the "guiding means" in the '345 Patent performs the same function as that performed by the key words in the database table in claim 1 of the '386 Patent. In fact, the specification acknowledges that words of text (key words) can be an example of the "guiding means." '345 Patent, at 18:46-47. Not one of these claims recites anything more than the abstract idea of aggregating and displaying content using a generic database.

The remaining independent claim in the Electronic Mall Patents, claim 1 of the '047 Patent, recites the same steps of requesting content from two sources with the exception that the content be

displayed in such a manner that it appears the first and second content "originated" from the same host. The limitations of claim 1 of the '047 Patent have been summarized as follows. *See* '047 Patent, at 23:44-24:22.

| | |
|---|---|
| 1. A program storage device comprising a non-transitory memory storage medium readable by a server, tangibly embodying a program of instructions executable by the server to perform method steps for managing a plurality of content hosts on the server, said method steps comprising the steps of: | *Recitation of generic computer elements* |
| requesting a first dynamic content hosted by a first host, wherein requesting is performed by the server, and wherein said first host is selected from the group consisting of an e-mall, e-service, e-portal, satellite e-mall, e-shop, e-distributor and web site; | *Requesting content from first source* |
| requesting a second dynamic content hosted by a second host, wherein requesting is performed by the server, and wherein said second host is selected from the group consisting of an e-mall, e-service, e-portal, satellite e-mall, e-shop, e-distributor and web site; | *Requesting content from second source* |
| displaying the first dynamic content and the second dynamic content to a user accessing the second host as if the first dynamic content originated from the second host; | *Displaying first and second content* |
| configuring the server to control the user's interaction with the first dynamic content by causing the second host to fetch the first dynamic content from the first host; | *Recitation of generic computer elements* |
| configuring the server to control interfacing with the user accessing the first dynamic content and the second dynamic content through the second host; and | *Recitation of generic computer elements* |
| configuring the server to maintain user interaction with the first dynamic content at the second host. | *Recitation of generic computer elements* |

In its Complaint, UnoWeb attempts to draw parallels between the '047 Patent and the claims found patentable in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). *See* Dkt. 72 at ¶ 118 n.56. But unlike the patent-at-issue in *DDR Holdings*, whose claims required presenting the content with the same "look and feel" of the second computer, the claims here simply require providing the first and second content at the second host. Nothing more is required— certainly nothing that would create the same "look and feel" for the two sets of content, as required by the claims of the asserted patent in *DDR Holdings*, and nothing to say how the server is to maintain user interaction at the second computer. The claims are a barebones recitation of an age-old

concept in the field of print media—combine content from multiple sources and then display the aggregated content. Long before the advent of the Internet, newspapers and magazines had been providing content from multiple sources in the same publication in a manner that indicated the content originated from the same newspaper. The '047 Patent simply implements that concept over a computer network. The Electronic Mall Patents also do not disclose how the first content is displayed so that it appears to have been "originated from the second host." Absence of such critical specifics further cements the unpatentability of these patents. *See, e.g., In re TLI*, 2016 WL 2865693, at *9 ("The specification fails to provide any technical details for the tangible components, but instead predominately describes the system and methods in purely functional terms."); *Internet Patents*, at 1348 ("The mechanism for maintaining the state is not described, although this is stated to be the essential innovation.... Thus we affirm that [claim] is not directed to a patent-eligible subject matter").

Courts have repeatedly held that patents involving distributing content over networks, just like the Electronic Mall Patents at issue here, are directed to abstract ideas. For example, in *Ultramercial*, the Federal Circuit held that claims were abstract and unpatentable subject matter where they were directed to the very high-level idea of "displaying an advertisement in exchange for access to copyrighted media." 772 F.3d at 712-15. It did not matter that the claims included data gathering steps, similar to the ones recited in UnoWeb's electronic shopping mall patents, as none of these made the basic purpose of the claims any less abstract. 772 F.3d at 714-15. Similarly, in *Intellectual Ventures I, LLC v. Motorola Mobility LLC*, the District of Delaware recently held that a patent for distributing software updates was invalid where the claims, "[w]hen broken into their fundamental elements," recited nothing more than three very generic steps: "(1) presenting a directory of software updates at the user station, (2) selecting and transmitting the desired software

updates; and (3) receiving the requested software updates." 81 F. Supp. 3d 356, 365-66 (D. Del. 2015). The court held that "generically recit[ing] the steps of presenting, sending, and receiving, with no description of the underlying programming" was not enough to remove the claim from the realm of the abstract concepts. *Id.*

Here, the basic purpose underlying the asserted claims is no less abstract. Simply put, the Electronic Mall Patents recite generic steps for aggregating and providing related content over a computer network—an idea that has long existed. Nothing in the patents suggests that the claims are targeted to anything other than the longstanding concept of aggregating content. Following the weight of authority, the Court should hold that Electronic Mall Patents recite an abstract idea.

## IV. THE ASSERTED CLAIMS OF ELECTRONIC MALL PATENTS DO NOT DISCLOSE AN "INVENTIVE CONCEPT"

When, as here, the asserted claims are directed to an abstract idea, they are invalid unless they contain "an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, at 2357. But the limitations of the claims in the Electronic Mall Patents fail to impart an inventive concept because the claims involve "conventional steps, specified at a high level of generality" using nothing more than generic computers. *Mayo*, 132 S. Ct. at 1300. The claims also fail the machine-or-transformation test, which the Supreme Court has recognized is a "useful and important clue" to patentability. *Bilski*, 561 U.S. at 604.

UnoWeb's argument that the asserted claims are valid because they do not preempt the concepts covered by the numerous prior art "patents cited in the prosecution history" fails. *See e.g.,* Dkt. 72 at ¶¶ 90, 112, 135. Preemption is not determined by the abundance of prior art cited during the prosecution. Instead, preemption depends on whether "additional substantive limitations … narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea itself." *Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336,

1344-45 (Fed. Cir. 2013). UnoWeb's Electronic Mall Patents make no attempt to narrow the claims to any practical terms. Even the much narrower claims in *Accenture* were found unpatentable despite being limited to the insurance industry. *See id.* at 1345. The Court should, therefore, find that the Electronic Mall Patents fail *Alice*'s second step.

### A.      The Claims Recite Only Generic Computers to Perform The Limitations

The asserted claims of the Electronic Mall Patents fail to impart an inventive concept because they recite nothing more than generic computers acting in conventional ways to aggregate and display related information from multiple sources. The Supreme Court has held that "'[s]imply appending conventional steps, specified at a high level of generality,' [is] not 'enough' to supply an 'inventive concept'" and "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, at 2358. But that is exactly what the asserted claims of the Electronic Mall Patents do.

The only tangible limitations recited by the asserted claims in UnoWeb's Electronic Mall Patents are a "server computer," a "client computer," and a "database," all of which are references to generic computer technology. The specifications admit as much. *See* '386 Patent at 4:64-67 (describing a "web server" as the "back end" from "where users retrieve (content) from and view it at another computer (front end)."); *id.* at 5:15-19 (describing a client computer with a web browser as the "front end ... computer system where users view information (also called content and used interchangeably) that is located at another computer system (back end)."); *id.* at Figs. 13, 14, and 16 (illustrating generic database tables). The specifications further describe the client computer as containing common computer components: "a client computer has a screen that is the means of interfacing with a user. It also has web browser software that runs in the client computer memory. The web browser is the client computer user's interface. And it presents a web page as objects (e.g. HTML objects) to the user. The objects can be text, audio, video, image, forms, links, etc. Also, the

web browser communicates with a server computer." *Id.* at 6:37-43. The "server computer" has no special characteristics and is defined only in that it communicates with a client computer over the "Internet or Intranet by a TCP connection." *Id.* at 6:30-34. In essence, the client computer and server computer can be any type of computer that can communicate over the Internet.

The claims also include the use of databases to search and retrieve related information, which is the primary purpose of any database. However, these patents fail to explain how computers or databases actually improve upon the well-known business practice—they simply recite a purported problem concerning the unavailability of a "broad selection" of products for buyers to choose from and claim that it can be fixed by using generic computers operating conventional web-based technologies. Moreover, the database can be any type of table that can contain information, including text. Such generic computer implementation is insufficient to impart patentability into an abstract idea. The additional features of creating and accessing a database and identifying content based on key words fail to introduce any inventive concept, as both are well-understood, routine, and conventional activities. Indeed, as the court in *Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP* noted:

> A "database" is nothing more than an organized collection of information. Humans have been collecting and organizing information and storing it in printed form for thousands of years.... For just as long, humans have organized information so that it could be searched for and retrieved by users: For example, encyclopedias typically are organized in alphabetical order and are searchable using indexes, and articles generally contain cross-references to other articles on similar topics. These activities long predate the advent of computers. Such fundamental human activities are "abstract ideas" beyond the scope of § 101.

*Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP*, 128 F. Supp. 3d 103, 112 (D.D.C. 2015), aff'd, No. 15-7100, 2016 WL 3545138 (D.C. Cir. June 10, 2016). Thus, the claimed use of a database to look up information based on key terms, which is merely the ordinary application of databases, "long predate[s] the advent of computers" and fails to introduce an inventive step to the

claims.[9] The introduction of database tables to search and identify content based on keywords does not salvage the claims of the '386 and '047 Patents. The claims of the '345 Patent do not fare any better—the method claims found in the '345 Patent replace the database tables (found in '386 and '047 Patents) with "guiding means." *See* '345 Patent at 24:7-12. However, the "guiding means" are simply described as "encoded information" or "words," nothing more. *See* '345 Patent at 18:44-62. Nothing in the specification of the Electronic Mall Patents suggests that the use of words, encoded or otherwise, to find information is new or novel.

The asserted claims use generic computers and networks to perform conventional computer functions. All of the claim steps—"requesting," "indexing," "forming a database," "accessing," "selecting," "identifying" and "sending"—are stated at a high level of generality and merely describe what computers do, which is wholly insufficient to transform an abstract idea into a patentable invention. Courts have routinely held such steps to be insufficient. *See, e.g.*, *Ultramercial*, 772 F.3d at 715-16 (holding claims with steps such as "receiving" data," "providing" data, and "receiving" a request invalid under § 101); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *Content Extraction*, 776 F.3d at 1348 (holding that the use of a generic scanner and computer to perform the "well-understood, routine, and conventional activities" of recognizing and storing data did not confer patentability). The Court should do the same here and hold that the '386, '047 and '345 Patents' conventional steps performed by generic computers fail to impart an inventive concept.

---

[9] Moreover, online search tools such as Lexis and Westlaw have been available for decades. Similarly, Amazon.com allowed users to search for products using keywords prior to the filing date of the Electronic Mall Patents. The Electronic Mall Patents themselves recognize that Amazon.com was already in existence at the time of filing. *See e.g.*, '047 Patent at 1:35-36 ("One good example of a dynamic e-shop is Amazon.com.").

The claim limitations in the Electronic Mall Patents also fail to impart an inventive concept when viewed as an ordered combination. The combination of claim limitations does nothing more than retrieve and display content. Nothing in the claims improves the functioning of a computer. Indeed, other than stating that a server performs the claim steps, the sequence of claim limitations do not state how the computer performs these steps at all. Where, as here, generic computer components are utilized in conventional ways, they fail to breathe any patentability into an otherwise abstract idea. *See Alice*, at 2359 ("[T]he computer components ... 'ad[d] nothing ... that is not already present when the steps are considered separately.... The [] claims do not, for example, purport to improve the functioning of the computer itself," "[n]or do they effect an improvement in any other technology or technical field."). The asserted claims are thus ineligible under Section 101.

**B.    The Claims of the '047 Patent Fail To Disclose an Inventive Concept**

UnoWeb's complaint points to the Federal Circuit's decision in *DDR Holdings* to suggest that the '047 Patent should be similarly found patentable because it "generat[es] a composite web page that combine data from a first and second server and enable the server generating the composite webpage to maintain web client interaction that is accessing information from a third-party merchant."[10] *See* Dkt. 72 at ¶ 118. But UnoWeb's reliance on *DDR Holdings* is misplaced. The claims at issue in *DDR Holdings*, were specifically directed to systems and methods for generating a composite web page that had the "look and feel" of one webpage but contained the content from another webpage. *DDR Holdings*, 773 F.3d at 1249. The idea was to "combine the logo, background color, and fonts of the host website with product information from the [third-party] merchant" to prevent the third-party merchant from luring away the host website's visitor traffic. *Id.* at 1248. For

---

[10] UnoWeb makes similar assertions with respect to the claims of the '386 and '345 Patents. *See* Dkt. 1 at ¶¶ 75, 101. However, the claims of the '386 and '345 Patents do not recite the limitation requiring "displaying the first dynamic content and the second dynamic content to a user accessing the second host as if the first dynamic content originated from the second host." *See* '047 Patent, at 24:11-14. The mere combination of content in a web page is not an inventive concept.

this reason, the Federal Circuit found that unlike the claims at issue in *Alice* and similar cases, DDR's claims "do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id*. at 1257.

The claims of the '047 Patent, on the other hand, include no such limitations requiring the combining of logo, background color, and fonts of the host website with the content from a third-party merchant, or any other solution to a problem specific to the "realm of computer networks." They simply require the display of content from two hosts in one webpage. The aggregation of related content in one place cannot, without more, be patent-eligible subject matter. Neither the claims nor the patent provides any detail concerning maintaining user interaction with the content, and the mere creation of a composite webpage cannot be considered to introduce an "inventive concept." Indeed, this concept was already known in the DDR patent itself—a patent that preceded the filing of UnoWeb's patents by three years.[11] *See* Dkt. 72 at ¶ 118.

### C.     The Claims Fail the Machine-or-Transformation Test

The claims in UnoWeb's Electronic Mall Patents also fail the machine-or-transformation test, which the Supreme Court has recognized is "a useful and important clue" to patentability under Section 101. *Bilski*, 561 U.S. at 604. Under the machine-or-transformation test, "[a] claimed process can be patent-eligible under § 101 if: '(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *Ultramercial*, 772 F.3d at 716 (quoting

---

[11] As noted in *DDR Holdings*, the claims directed at creating a composite webpage were first disclosed in an application filed on September 17, 1998—more than three years prior to the earliest filing date of the '047 Patent.

*In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) (en banc)). The claims of the Electronic Mall Patents fail both prongs.[12]

The claims of the Electronic Mall Patents are not tied to a particular machine or apparatus. In order to meet the machine prong of the machine-or-transformation test, the claims must be tied to a "particular novel machine or apparatus," not a "general purpose computer." *Ultramercial*, 772 F.3d at 716. As explained in Section IV.A *supra*, the computers recited by the claims are generic computers. The addition of a database table to store and query key words does not impart any special-purpose functionality into the claims. *See Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 56 F. Supp. 3d 813, 823 (E.D. Va. 2014) ("storing and querying information in a database, and building reports based on that information, is one of the most basic functions of a database system."). The claims also fail the transformation prong. None of the claims transform any physical article into a different state or thing, but merely involve the receipt and display of data. Such limitations "cannot meet the test because they are not physical objects or substances, and they are not representative of physical objects or substances." *Id.* at 717. The claims, therefore, fail to satisfy either prong of the machine-or-transformation test.

### D.   Dependent Claims Include Trivial Limitations that Fail to Amount to an "Inventive Concept"

The dependent claims in UnoWeb's Electronic Mall Patents are directed to the same abstract idea, with only trivial additions.[13] For example:

- Claims 2 and 5 of the '386 Patent and claim 2 of the '345 Patent limit the type of content that could be displayed.

---

[12] Though the complaint states that the claims are directed to specific machines and data structures (*see e.g.,* Dkt. 72 at ¶¶ 76, 95, 115, 120, 138, 165, 183-184, and 209) no such specific machines or data structures are alleged.  Rather, only general purpose servers and generic databases are mentioned in the patents and in the claims.

[13] Defendant has included a discussion of only the asserted dependent claims of the Electronic Mall Patents. To the extent UnoWeb asserts additional claims, Defendant reserves the right to request supplementation of briefing to address any currently unasserted claims. That said, the unasserted claims of the Electronic Mall Patents are unpatentable for the same reasons as the claims discussed above.

- Claim 3, 6, and 9 of the '386 Patent and claim 4 of the '345 Patent limit the relationship between the first and second content based on certain types of information.

- Claim 7 of the '386 Patent and claims 5-6 of the '345 Patent limit the location of the third-party content.

- Claim 3 of the '345 Patent limits the type of content provided by the third-party merchant—*e.g.,* auction, car sales, realty, sports, news, weather, etc.

- Claim 7 of the '345 Patent requires indexing of the third-party content.

- Claim 8 of the '345 Patent requires the storing of third-party content.

- Claim 2 of the '047 Patent requires management of the content.

- Claim 3 of the '047 Patent requires the database table to have rows in which identification marks for the first and second content can be stored.

- Claim 4 of the '047 Patent requires management of dynamic and virtual databases and database tables. The specification concedes that management is performed by existing software—not the purported novelty of the '047 Patent. *See* '047 Patent at 5:35-38.

- Claim 5 of the '047 Patent requires the second host to interact with the user.

None of these limitations transform the basic concept into a non-abstract idea. Simply adding minor variations claiming "activities which are made possible by generic computers" to the abstract idea fails to meaningfully limit the claims beyond the abstract idea. *See Joao,* 2014 WL 7149400, at *3. The dependent limitations, therefore, do not alter the conclusion that the claims of the Electronic Mall Patents are directed to an abstract idea.

## V.   UNOWEB'S "INVENTION" OF SHARING REVENUES WITH MULTIPLE PARTIES IS AN UNPATENTABLE ABSTRACT IDEA

UnoWeb's Revenue Sharing Patents seek to monopolize the concept of distributing revenues between multiple parties—collecting revenue from the advertisers and distributing it between the

content providers and the content distributors (*i.e.*, content host). The preambles of the claims of Revenue Sharing Patents make it abundantly clear that the claims are directed to the concept of "advertising revenue sharing." *See e.g.*, '858 Patent, 8:58-59. But the idea of sharing revenue—*i.e.*, distributing money—is neither new nor inventive. Revenue sharing between multiple parties (*e.g.*, creator/manufacturer and distributor/provider) has been practiced for centuries, if not longer. Indeed, the concept of sharing revenues with sales persons working on commission had been implemented long before February 21, 2007—the earliest filing date of the Revenue Sharing Patents. In sales of tangible goods sold by sales persons, the incoming revenue is received by the content provider (*e.g.*, shop owner) and a portion of the revenue receipts would be given to the sales person as their commission. Similarly, in a supply-chain model involving manufacturers and distributors, the distributor would receive a portion of the revenue as compensation for setting up the distribution channel while the remaining revenue would be received by the manufacturer. Thus, the Revenue Sharing Patents seek to monopolize a longstanding business practice.

UnoWeb also contends that the Revenue Sharing Patents involve a mechanism by which "click-fraud" is controlled. *See e.g.*, Dkt. 72 at ¶¶ 10, 57, 141. "Click-fraud" results when a person clicks on an advertisement repeatedly, not with the intent to pursue the advertisement but in an attempt to generate higher revenues for a content provider. *See id.* at ¶ 158 n.69. The repetitive clicks result in overcharging advertisers for invalid clicks. The Revenue Sharing Patents purportedly prevent "click-fraud" by placing a limit on the number of times a user can click on an advertisement, or by "requir[ing] a time threshold" before an advertisement can be redisplayed. *See id*. at ¶¶ 156, 158. Simply put, the Revenue Sharing Patents prevent the end-user from accessing the advertisement if the number of requests has surpassed an upper limit or unless an insufficient time has passed since the user's last request. *See* '858 Patent at 5:55-63.

The claims of the Revenue Sharing Patents simply combine two abstract ideas (revenue sharing and preventing over-access by a user) into one claim. But grouping multiple abstract ideas in a single claim does not transform the abstract concepts into patentable subject matter. *See Shortridge v. Payroll4Construction.com*, No. 3-14-cv-04850, 2015 WL 1739256, at *11 (N.D. Cal. Apr. 14, 2015) ("[M]erely combining two or three abstract ideas [does not] bring a patent within the scope of Section 101") (citing *Content Extraction*, 776 F.3d at 1347).

A.   **The Revenue Sharing Patents Do Not Provide a Technical Solution To a Technical Problem**

Contrary to UnoWeb's assertions, the problem associated with "click-fraud" (*i.e.*, determining the validity of a click/transaction) is neither new nor is it isolated to the Internet.[14] *See* Dkt. 72 at ¶ 157. Long before the earliest filing of the Revenue Sharing Patents, pharmacies had been finding ways to determine whether a customer seeking to buy prescription medicine was doing so to cure a legitimate medical issue or to engage in medicinal abuse or illegal purchase of drugs. The problem was solved by introducing a time threshold between successive purchases of controlled substances by an individual customer—a pharmacist would have to determine whether the same patient asked for the same drugs within too-short period of time. If the same patient requested the same drugs within too short-period of time, the request would not be fulfilled. Thus, neither the problem of over-access, nor the solution of imposing temporal restrictions to avoid paying for over-access was unique to the Internet. Most importantly, making such a determination can be a purely mental process performed using simple arithmetic—the pharmacist would merely need to identify each patient and keep track of when each patient made a previous request. "[M]ental processes" such

---

[14] Moreover, the problem associated with detecting invalid clicks is a financial problem, not a technical one. As the Revenue Sharing Patents explain: "[i]t is the object of this invention to provide a fair and just mechanism for compensating all of the involved parties helping in the generating of the income stream for the hosting site, content provider and user ...." *See* '858 Patent at 2:58-61. Thus, by its very nature, the problem associated with click-fraud is financial in nature.

as this "are not patent-eligible subject matter." *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011).

The Revenue Sharing Patents aim to curb "click-fraud" by implementing the exact same solution as pharmacists, albeit on the Internet. The user's request for advertisement (*i.e.*, the click) is recorded in time. Each successive request is then compared against the preceding request to determine whether it is too close in time. If the request is under a certain time threshold, then the request is not serviced or counted. Some claims also set an upper limit on the number of times the content can be accessed. Claim 2 of the '139 Patent, which is representative of all independent claims in the Revenue Sharing Patents,[15] can be summarized as follows.

| | |
|---|---|
| 2. A method of web site development based on advertising revenue sharing, comprising the steps of: | *Preamble* |
| enabling a person to become a registered user; | *Registering a user* |
| displaying paid content from an advertiser through a webpage of the web site on a computer; | *Displaying content on a webpage* |
| registering a content provider to prepare non-paid content for the webpage on a computer; | *Registering a content provider* |
| setting a time period before which paid content can be redisplayed to a registered user; | *Setting time limits* |
| setting a maximum number of times that paid content can be displayed to a registered user; | *Setting access limits* |
| totaling a number of times the paid content is displayed to the registered user; | *Totaling access by user* |
| receiving payment from the advertiser for the number of times the paid content is displayed to the registered user; and, | *Receiving payment from advertiser* |
| paying the content provider for the number of interactions of the registered user with the paid content. | *Paying content provider* |

Reduced to its conceptual elements, this claim requires (1) displaying content on a webpage, (2) setting a time limit before a user can re-access content, (3) setting a limit for the number of times a user can access content, (4) adding the number of times a user actually accesses content, (5)

---

[15] Claim 2 of the '139 Patent is representative of claim 5 of the '139 Patent and claim 3 of the '858 Patent. Claims 6 and 7 of the '384 Patent—the remaining asserted independent claims of the Revenue Sharing Patents—also claim similar subject matter with minor differences. Those differences are addressed below. Additional limitations included in dependent claims are also addressed below. *See infra* Section VI.C.

receiving payment based on the number of times a user accesses content, and (6) paying the content provider. The claim simply describes a financial transaction that is aided by simple arithmetic associated with adding the number of times certain content is accessed by the user and setting a time threshold before content can be re-accessed by the user.

Claim 6 of the '384 Patent captures the same concept with the addition of a few steps that combine "paid content" and "free content" on a "content page" and displays the "content page" to the user. *See* '384 Patent at 44:1-19. Claim 7 of the '384 Patent adds a "server computer" as a limitation, which is used for receiving the user's request for content. The entirety of claims 6 and 7 are composed of purely mental processes of calculating the number of legitimate requests to access content and then determining the amount of compensation based on the number of legitimate requests, which does not amount to "patent-eligible subject matter." *CyberSource*, at 1371. For example, a person examining a log of all clicks made over time can identify that clicks occurring in short periods of time reflect clicks that do not indicate a bona fide indication of interest. The steps of providing and displaying paid and free content fail to breathe patentability into a series of mental steps. Courts routinely hold that the types of conventional steps recited in these claims do not confer an inventive concept. *See, e.g.*, *Ultramercial*, 772 F.3d at 715-16 (holding claims with conventional steps such as "receiving" data, "providing" data, and "receiving" a request invalid under Section 101); *buySAFE*, at 1355 ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *Content Extraction*, 776 F.3d at 1348 (holding that the use of a generic scanner and computer to perform the "well-understood, routine, and conventional activities" of recognizing and storing data did not confer patentability).

That the concept claimed in the Revenue Sharing Patents is an unpatentable abstract idea is further cemented by the fact that it relates to the commercial activity of distributing revenues

generated by accessing advertisements. Advertising, like the practices of hedging in *Bilski* and intermediated settlement in *Alice*, is a fundamental economic practice. *See Content Extraction*, at 1347 (explaining that claims directed to commercial activity, such as "formation and manipulation of economic relations" or "performance of certain financial transactions" involve abstract ideas) (collecting cases). Methods associated with advertising inevitably address the "human activity" of generating market interest in products or services. *See Ultramercial*, at 715 (holding claims to "a method of using advertising as an exchange or currency" were "directed to an abstract idea"); *OpenTV v. Netflix*, 76 F.Supp.3d 886, 893 (N.D. Cal. 2014) (holding claims to a method of targeted advertising implemented "long prevalent concepts" associated with advertising). The Revenue Sharing Patents, thus, satisfy the first prong of the *Alice* inquiry.

## VI.   THE ASSERTED CLAIMS OF REVENUE SHARING PATENTS DO NOT DISCLOSE AN "INVENTIVE CONCEPT"

### A.   The Claims Recite Only Generic Computers to Perform Conventional Steps

The claims of the Revenue Sharing Patents fail to recite any limitations that transform the abstract idea into patentable subject matter. Instead, the claims merely spell out the abstract idea and claim its application in a technological environment requiring websites, server computers and client computers. Nothing in the Revenue Sharing Patents even remotely suggests that websites were a novel concept that had not been previously known. To the contrary, the specification of the Revenue Sharing Patents readily admits that at the time of the purported invention "[t]here [were] many ways for placing contents in a web site." *See* '858 Patent, at 2:64-3:5. Similarly, the patents acknowledge that the use of server computers and client computers was already known prior to the filing of the Revenue Sharing Patents. *See id.* at 2:64-3:5 ("There are many ways for placing contents in a web site, by having a <u>server</u> as the host of the contents and the advertising or registered web sites presenting them to user trough a web service (a program in the server to allow the server to serve a

requesting computer with services and/or contents)....") (emphasis added); *id.* at 2:32-42. Thus, to solve the "problem" associated with revenue sharing and customer over-access, the patents simply use well-known technology.

Just as in the Electronic Mall Patents, the Revenue Sharing Patents acknowledge that no special purpose hardware or software is needed to implement the abstract concept. *See id* at 2:34-36 ("[T]he present invention may take a form of an entirely software embodiment or an embodiment concerning software and hardware … [or] a computer program product on a computer-readable storage medium having computer-readable program code…."). Moreover, nothing in the Revenue Sharing Patents requires a specific configuration of any hardware or software elements. To the contrary, the Revenue Sharing Patents concede that the configuration of the "individual elements within each disclosed embodiment may be modified without departing from the spirit and scope of the invention." *Id.* at 2:22-24. The acknowledged ambivalence to how the computers perform the abstract idea of sharing revenues further confirms that Revenue Sharing Patents are business method patents devoid of any technical merit. Such generic computer implementation does nothing to transform the abstract idea into a patentable concept—indeed, it is merely an impermissible attempt to monopolize a longstanding business practice using computers. *CyberSource*, at 1375; *see also buySAFE*, at 1354 ("[A] claim directed to an abstract idea does not move into section 101 eligibility territory by merely requiring generic computer implementation.").

## B.    The Revenue Sharing Claims Fail the Machine-or-Transformation Test

As discussed in Section VI.A *supra*, the claims of the Revenue Sharing Patents are not tied to a particular machine or apparatus.[16] The claims simply recite generic computers that operate in conventional ways. That is simply not enough to resuscitate claims directed towards an abstract idea.

---

[16] Though the complaint states that the claims are directed to specific machines and data structures (*see e.g.*, Dkt. 72, ¶¶ 76, 95, 115, 120, 138, 165, 183-184, and 209) no such specific machines or data structures are alleged.  Rather, only general purpose servers and generic databases are mentioned in the patents and in the claims.

The claims also fail the transformation prong of the machine-or-transformation test. None of the claims transform any physical article into a different state or thing, but merely involve the receipt of revenue by certain parties and display of content. Such limitations "cannot meet the test because they are not physical objects or substances, and they are not representative of physical objects or substances." *Id.* at 717 (quoting *In re Bilski*, 545 F.3d at 963). The claims, therefore, fail to satisfy the transformation prong of the machine-or-transformation test.

### C.   Dependent Claims Include Trivial Limitations that Fail to Amount to an "Inventive Concept"

The dependent claims in UnoWeb's Revenue Sharing Patents are directed to the same abstract idea as the independent claims, with only trivial additions.[17] For example:

- Claim 6 of the '139 Patent and claim 4 of the '858 Patent require the user to be a "registered user."

- Claim 7 of the '139 Patent requires the user to "view[] the webpage."

- Claim 8 of the '139 Patent requires payment to the user for the revenues generated by their interaction with the content.

- Claim 9 of the '139 Patent requires the webpage to include "virtual content"—content that is hosted in one location and virtually presented at many other locations. *See* '139 Patent at 3:41-56.

- Claim 10 of the '139 Patent requires a time period to be set before which paid content can be redisplayed to a registered user.

- Claim 8 of the '384 Patent requires the website to include a link to paid content, and paying the content distributor for each access to the paid content.

---

[17] To the extent UnoWeb asserts additional claims, Defendant reserves the right to request supplementation of briefing to address any currently unasserted claims. That said, the unasserted claims of the Revenue Sharing Patents are directed at the same subject matter and are unpatentable for the same reasons as the claims discussed above.

None of these limitations transform the abstract idea of revenue sharing and fraud prevention into a patent-eligible non-abstract idea, or somehow impart an inventive concept into the abstract idea. These claims simply add minor variations claiming "activities which are made possible by generic computers" to the abstract idea, which fails to meaningfully limit the claims beyond the abstract idea. *See Joao,* 2014 WL 7149400, at *3.

## VII.    THE COURT SHOULD DISMISS UNOWEB'S ALLEGATIONS OF INDUCED INFRINGEMENT

UnoWeb's complaint fails to plausibly allege induced infringement. In order to allege induced infringement, UnoWeb must plausibly allege that (1) a third party has performed acts constituting infringement, (2) Comcast or NBCU knew of the asserted patent and that such acts would infringe, and (3) Comcast or NBCU had specific intent to encourage the third-party's infringement. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) ("[I]nduced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement."); *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304-05 (Fed. Cir. 2006) (en banc) ("[I]nducement requires 'that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.'"); *see also Tierra Intelectual Borinquen, Inc. v. ASUS Computer Int'l, Inc.*, Case No. 2:13-cv-38-JRG, 2014 WL 894805, at *2 (E.D. Tex. Mar. 4, 2014). "[I]nduced infringement requires specific intent, as distinguished from mere knowledge. Such intent must be proven by evidence of affirmative acts undertaken by the defendant to encourage or otherwise promote infringement." *Tierra*, 2014 WL 894805, at *5.

UnoWeb has formulaically alleged induced infringement of each asserted patent. With respect to each patent, UnoWeb generically alleges the elements of induced infringement, along with conclusory allegations of specific intent. *See* Dkt. 72 at ¶¶ 231, 258, 282, 307, 332, 352. UnoWeb concludes that "[b]y providing instruction and training to customers and end-users on how to use the Comcast [patent number] Product in a manner that directly infringes one or more claims of the

[patent], . . . Comcast specifically intended to induce infringement of the [patent]." *Id.* Finally, UnoWeb alleges, "[o]n information and belief," that "Comcast engaged in such inducement to promote the sales of the Comcast [patent number] Product, *e.g.*, through Comcast tutorials, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the [patent]." *Id.*

These allegations fail to plausibly allege that Comcast or NBCU had specific intent to encourage any third party's infringement. Absent from these allegations is any identification of the supposed "documentation and training materials" or "instruction and training" that Comcast or NBCU provides, or any explanation of how any of these materials induce infringement. UnoWeb's allegations do not even identify *who* it is that is infringing, broadly referring to "third-party customers and users." Indeed, the accused products are not even identified with any specificity. The Complaint fails to identify any third party whose alleged infringement forms the basis of UnoWeb's indirect infringement claims. Dkt. 72 at ¶¶ 212, 237, 264. In essence, UnoWeb alleges that Comcast or NBCU induces infringement by providing unidentified documentation and training materials to unidentified third parties, who use some Comcast or NBCU website or mobile application to somehow infringe. Such allegations fall short of "allow[ing] the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court should therefore dismiss UnoWeb's induced-infringement claims.

## CONCLUSION

The asserted claims of UnoWeb's Electronic Mall Patents and Revenue Sharing Patents are directed to abstract ideas. The asserted claims carry out their respective abstract ideas using generic computers and networks acting in conventional ways. Under *Alice*, such claims do not satisfy 35 U.S.C. § 101 and are invalid. The Court should therefore dismiss this case.

Dated:  July 22, 2016

Respectfully submitted,

By: /s/ Christopher V. Ryan

**LOCAL COUNSEL**

Deron R. Dacus (TBN 00790553)
**THE DACUS FIRM, PC**
821 ESE Loop 323
Suite 430
Tyler, TX 75701
Tel: (903) 705-1117
Fax: (903) 581-2543
ddacus@dacusfirm.com

David B. Weaver (TBN 00798576)
Christopher V. Ryan (TBN 24037412)
Lead Counsel
Brian W. Oaks (TBN 24007767)
Syed K. Fareed (TBN 24065216)
Christopher G. Granaghan (TBN 24078585)
Valerie Barker (TBN 24087141)
**BAKER BOTTS L.L.P.**
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4078
Tel: (512) 322-2500
Fax: (512) 322-2501
david.weaver@bakerbotts.com
chris.ryan@bakerbotts.com
brian.oaks@bakerbotts.com
syed.fareed@bakerbotts.com
christopher.granaghan@bakerbotts.com
valerie.barker@bakerbotts.com

*Attorneys For Defendants Comcast Cable Communications, LLC and NBCUniversal Media, LLC*

## CERTIFICATE OF COMPLIANCE WITH THE COURT'S 35 U.S.C. § 101 MOTION PRACTICE ORDER

_____   The parties **agree** that prior claim construction is not needed to inform the  Court's analysis as to patentability.

___x___   The parties **disagree** on whether prior claim construction is not needed to inform the Court's analysis as to patentability.

/s/Christopher V. Ryan
Christopher V. Ryan

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5.3 on the 22nd day of July, 2016 As such, this document was served on all counsel who are deemed to have consented to electronic service.

/s/Christopher V. Ryan
Christopher V. Ryan